534 A.2d 760

**COUNTY OF ALLEGHENY, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 18, 1986.

Decided Dec. 7, 1987.

Reargument Denied Jan. 19, 1988.

James J. Dodaro, County Sol., Thomas M. Rutter, Jr., First Asst. County Sol., Robert L. McTiernan, Asst. County Sol., Pittsburgh, for appellant.

Donald Minahan, Chief Deputy Atty. Gen., Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

68

## OPINION OF THE COURT

FLAHERTY, Justice *.

The question raised by this appeal is whether the various counties of Pennsylvania are required by statute to fund the common pleas court system, and if they are, whether such a funding scheme is constitutional.

On March 16, 1985 Allegheny County filed an Application for Declaratory Judgment in Commonwealth Court addressed to that court's original jurisdiction, 42 Pa.C.S.A. § 761(a). The County sought a declaration that it was not obligated by statute to fund the Common Pleas Court of Allegheny County and an order directing the Commonwealth to fund all aspects of the unified court system of Pennsylvania. Simultaneously, the County also requested this Court to assume extraordinary jurisdiction over the matter. We denied the request for extraordinary jurisdiction and the case proceeded in Commonwealth Court.

In its Application the County alleged that for the fiscal year 1984 it expended $22,327,415 for personnel, facilities, and services necessary for the operation of the county court system and that it employed over 800 persons who were necessary for the court's functioning. It further alleged that because the number and compensation of employees necessary for the functioning of the court are controlled by county officials other than judges of the Court of Common Pleas, there are continuing disputes between the County and the Court of Common Pleas concerning the funding of these employees. Similarly, according to the County's application, there are recurrent disputes over the level of funding necessary for supporting facilities and services, which the County acknowledges it is required by statute to provide. 42 Pa.C.S.A. § 3721(a).

In response to the County's Application for Declaratory Judgment, the Commonwealth filed preliminary objections in the nature of a demurrer, alleging, inter alia, that the County failed to set forth a cause of action upon which

* This case was reassigned to this writer on February 25, 1987.

relief may be granted; that the relief sought contravenes the separation of powers doctrine; that the constitutional challenges are without foundation; and that Commonwealth Court was without power to direct the Executive Branch to fund the courts. Commonwealth Court sustained the demurrer on the grounds that the Application presented no justiciable controversy and the court was without power to fashion the remedy requested by the county.

Citing *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Commonwealth Court reasoned that the issues raised in this case are non-justiciable because there is "a textually demonstrable constitutional commitment of the issue to a coordinate governmental branch and impossibility of an appropriate judicial remedy." 93 Pa.Comwlth Ct. 112, 114, 500 A.2d 1267 (1985). In other words, in the view of Commonwealth Court, the matter was not capable of resolution by the courts since it had been constitutionally assigned as being within the sole province of another branch of government. In support of this view, the court made reference to this Court's decision in *Shapp v. Sloan*, 480 Pa. 449, 469, 391 A.2d 595 (1978) in which we held that the General Assembly "has been given the constitutional power to determine what [governmental] programs will be adopted ... and how they will be financed."

■ We disagree that the issues raised in this case are non-justiciable. The United States Supreme Court in *Baker v. Carr* defined "non-justiciability" as follows:

In the instance of non-justiciability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.

369 U.S. at 198, 82 S.Ct. at 700, 7 L.Ed.2d at 674. Since this is a declaratory judgment action, the court's inquiry concerns the ascertainment of the rights of the parties and whether protection for the asserted right can be judicially

molded. *See* The Declaratory Judgments Act, 42 Pa.C.S.A. §§ 7531–7541.

■ In *Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595 (1978), this Court recognized the authority of the General Assembly to control the state's finances, but the Court also recognized that the General Assembly's control of fiscal matters might, in particular circumstances not present in that case, be limited by the constitution. *Shapp v. Sloan*, therefore, is no authority for the proposition that control of the state's finances has been incontrovertibly and in all instances assigned to the authority of the General Assembly. Moreover, in *Beckert v. Warren*, 497 Pa. 137, 145, 439 A.2d 638 (1981), we reaffirmed the holding of *Leahey v. Farrell*, 362 Pa. 52, 57, 66 A.2d 577, 579 (1949), that although control of state finances rests with the legislature, that control is subject to constitutional limitations.

■ Essentially, this is a case in which Commonwealth Court was called upon to determine, by way of familiar principles of constitutional and statutory construction whether the General Assembly has imposed any obligations on the County to fund Pennsylvania's court system, and if it has, whether these obligations are constitutional. Since, as we have seen, the financing of state institutions has not been incontrovertibly and in all cases relegated to the direction and control of the General Assembly, and since the rights of the parties were able to be determined by construction of the relevant statutes and constitutional provisions, it was error for Commonwealth Court to hold that the case is non-justiciable and to enter judgment upon preliminary objections.

Ordinarily, we would remand for trial a case erroneously decided upon preliminary objections, but in this case Commonwealth Court also addressed the merits and resolved them against the County. Since the record is complete and we are required only to address legal, not factual questions, we will treat the case as having been decided upon the merits below.

■ The first issue raised by the County is whether there is a statutory requirement that the County fund the courts within its judicial district. Although the County concedes that it is required by the Judicial Code, 42 Pa.C.S.A. § 3721, to furnish certain accommodations, goods and services for the functioning of the courts within its judicial district, it argues that there is no statutory requirement that it employ personnel for use in the court system.

The Judicial Code requires that County officials provide adequate staff for the courts:

> Whenever necessary, it shall be the duty of county officers to appoint or detail such county staff as shall enable the judges of the courts embracing the county to properly transact the business before their respective courts.

42 Pa.C.S.A. § 2302. Further, the County is required to establish and maintain a judicial and related account. 42 Pa.C.S.A. § 3541. Out of this account the County must pay:

> (1) Salaries, fees and expenses of:
>
> (i) Appointive judicial officers.
>
> (ii) Other system and related personnel which by statute are required to be paid by the political subdivision.
>
> (2) Salaries, fees and expenses of jurors, witnesses and all other persons paid under authority of law by the political subdivision for the maintenance of judicial and related functions.

42 Pa.C.S.A. § 3544. The Code also provides:

> Except as otherwise provided by statute, each county shall continue to furnish to the court of common pleas and community court embracing the county, to the minor judiciary established for the county and to all personnel of the system, including central staff entitled thereto, located within the county, all necessary accommodations, goods and services which by law have heretofore been furnished by the county.

42 Pa.C.S.A. § 3722. Finally, we note that the Second Class County Code mandates that a salary board shall fix the compensation of certain court employees:

> The board, subject to limitations imposed by law, shall fix the compensation of all appointed county officers, and the number and compensation of all deputies, assistants, clerks and other persons whose compensation is paid out of the county treasury, and of all court criers, tipstaves and other court employes, and of all officers, clerks, stenographers and employes appointed by the judges of any court and who are paid from the county treasury.

16 P.S. § 4823. *See also* The County Code, 16 P.S. § 1623, where similar obligations are imposed upon counties of the third through eighth classes. In sum, it is apparent that the General Assembly intended to create a legislative scheme in which funding of the various judicial districts was primarily a responsibility of the counties, and that these responsibilities include the funding of salaries, services and accommodations for the judicial system.[1] We conclude, therefore, that the County's statutory claim is without merit.

▮▮▮▮ Next the County claims that the current system of requiring the counties to fund the respective court systems within their judicial districts is unconstitutional in that it does not create a unified court system, as is mandated by Article 5, Section 1 of the Pennsylvania Constitution. That provision states:

> The judicial power of the Commonwealth shall be vested in a *unified judicial system* consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the

---

1. *Accord, Beckert v. Warren,* 497 Pa. 137, 439 A.2d 638 (1981), where this Court held that the Judicial Code and the County Code together require not only that counties fund reasonably necessary court personnel, but also that they fund new positions which were found to be reasonably necessary.

peace. *All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.* (Emphasis added). Whether the county's claim has merit will depend, in large part, upon the meaning of "unified."

Webster's Third New International Dictionary defines "unify," in pertinent part, as follows:

> to cause to be one: make into a coherent group or whole: give unity to: HARMONIZE

The County's claim, in essence, is that the current method of funding is inimical to a "unified judicial system," and indeed, is fraught with dissention and conflict which produces fragmentation. In support of this claim, the County points out that because it determines the number of employees who are necessary to the functioning of the Court of Common Pleas, 16 P.S. § 4820 and 4823, and their compensation, 16 P.S. § 4820 and 4823, and acts as their employer for collective bargaining purposes, *See Ellenbogen v. County of Allegheny,* 479 Pa. 429, 388 A.2d 730 (1978), these mandated activities often embroil county authorities in disputes with the various judicial districts. Such disputes include disagreement over the scope of bargaining power of the County Commissioners, *County of Allegheny v. Allegheny Court Association of Professional Employees,* 22 Pa. D & C 3d 166 (1981), aff'd 67 Pa.Comwlth.Ct. 277, 446 A.2d 1370 (1982); alloc. denied, Oct. 18, 1982; whether the Board has legislative power to reject labor arbitration awards, *County of Allegheny v. Allegheny Court Association of Professional Employees,* 99 Pa.Comwlth. 530, 513 A.2d 1101, and whether the County's mandatory retirement system should be implemented with respect to court employees, *Kaplan v. Foerster, et al.,* Alleg. Co. Court of Common Pleas,

Moreover, in addition to matters related to collective bargaining and pension funds, there is a history of strife between the various judicial districts and the counties regarding funding. To cite only three examples, in the leading case of *Leahey v. Farrell,* 362 Pa. 52, 66 A.2d 577 (1949), the Court of Common Pleas of Cambria County

entered a mandamus Order against the county to pay salary increases for court stenographers. In *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193 (1971), the Court of Common Pleas of Philadelphia sued to require the Mayor and City Council of Philadelphia to appropriate additional funds requested by the court for expenses related to court administration for the fiscal year 1971. And in *Beckert v. Warren,* 497 Pa. 137, 439 A.2d 638 (1981) the judges of the Court of Common Pleas sued to enjoin the County Commissioners from adopting a budget for the year 1981 which did not fund the court's requests and which did not fund certain new positions.

It goes without saying that when relations between the judicial branch and the county governments deteriorate to the point where litigation is required to settle disagreements as to funding, the relationship is neither harmonious nor unified, but rather, fragmented. The Commonwealth argues that however this may be, the framers of the 1968 Constitution did not address the question of funding, and intended, therefore, that the courts should continue to be funded as they had in the past.

While it is true that the 1968 Constitution of Pennsylvania does not specify the manner in which courts are to be funded, the constitution does require that the judicial system shall be unified. It is inconceivable that unity, in any meaningful sense of that word, can be attributed to a court system characterized by management and fiscal disagreements which periodically culminate in litigation in which the various counties and the courts within them are set off against each other as antagonists.

Although the dissent argues that the county court system is currently funded by an exercise of the taxing power delegated to the counties by the state, and that there is, therefore, no absence of unity in the system, this argument is illusory. While it may be true that the county derives its taxing power from the state, it is also true, nevertheless, that these "state" funds are being *administered by local*

*authorities* in a manner that causes continual friction and dissention.

Our interpretation of the concept "unified judicial system" depends, as does virtually all constitutional construction, not only upon a literal meaning of words, but also upon an awareness of the legal and constitutional implications of those words. In addition to the concerns already discussed, two additional matters should be mentioned.

First, the employment of staff. The purpose of a unified judicial system is to provide evenhanded, unbiased and competent administration of justice. The expectation is that cases will be processed as well in one county as another. In order to meet this expectation, however, judicial resources and staffing must be proportionately similar in all judicial districts. There must be uniform hiring practices and standards, and judges must be free to hire competent staff, not merely those referred by local political figures. If the staffing of court-related positions is treated as an opportunity to repay political debts rather than as an opportunity to serve the public by hiring qualified people who are able to make the system work efficaciously, the system will be neither evenhanded nor competent.

A second matter is the public's perception of the judicial system. The citizens of this Commonwealth have a right not only to expect neutrality and fairness in the adjudication of legal cases, but also, they have a right to be absolutely certain this neutrality and fairness will actually be applied in every case. But if court funding is permitted to continue in the hands of local political authorities it is likely to produce nothing but suspicion or perception of bias and favoritism. As the framers of our constitution recognized, a unified system of jurisprudence cannot tolerate such uncertainties. All courts must be free and independent from the occasion of political influence and no court should even be perceived to be biased in favor of local political authorities who pay the bills.

For the foregoing reasons we hold that the statutory scheme for county funding of the judicial system is in

conflict with the intent clearly expressed in the constitution that the judicial system be unified. The order of Commonwealth Court is vacated and judgment is entered for the County.

However, because this order entails that present statutory funding for the judicial system is now void as offending the constitutional mandate for a unified system, we stay our judgment to afford the General Assembly an opportunity to enact appropriate funding legislation [2] consistent with this holding. Until this is done, the prior system of county funding shall remain in place.[3]

HUTCHINSON, J., did not participate in the decision of this case.

NIX, C.J., filed a dissenting opinion which McDERMOTT, J., joined.

NIX, Chief Justice, dissenting.

The majority relies upon a non-existent constitutional mandate, which they justify by the fiction of an insolubly disruptive relationship between county government and the court system, to intrude upon the province of an equal branch of government and thereby offend a doctrine that this Court has consistently held to be sacrosanct. *See, e.g., Young v. Commonwealth, Board of Probation and Parole*, 487 Pa. 428, 409 A.2d 843 (1979); *In re 42 Pa.C.S. § 1703*, 482 Pa. 522, 394 A.2d 444 (1978); *Commonwealth*

---

**2.** The authority of this Court to direct payment of funds necessary for the funding of the judicial system does not intrude upon the legislative power of appropriation, but is merely an exercise of this Court's inherent power to preserve itself as a coordinate branch of government. *See Leahey v. Farrell*, supra; *Commonwealth ex rel. Carroll v. Tate*, supra.

**3.** Our approach to the problem of maintaining a constitutionally flawed system until another system can be implemented is borrowed from the United States Supreme Court in *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598, 626 (1982). In that case the Court held that although the legislative grant of authority to bankruptcy judges was unconstitutional, the holding was to be applied prospectively only and was stayed in order to afford Congress an opportunity to address the problem created by its statute.

*v. Sutley,* 474 Pa. 256, 378 A.2d 780 (1977); *Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698 (1977); *Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474 (1969); *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193 (1971). This unabashed interference with a legislative scheme clearly within the province of the General Assembly mandates my dissent.

The two issues raised in this appeal are whether the various counties are required by statute to fund the common pleas court system from their respective tax revenues and, if they are, whether such a directive is violative of the constitutional mandate providing for a Unified Judicial System in this Commonwealth. I agree with the majority's conclusion that the counties are statutorily required to maintain the courts of common pleas within their county, 42 Pa.C.S. § 2302; 42 Pa.C.S. § 3544; 42 Pa.C.S. § 3722; 16 P.S. § 4822; and 16 P.S. § 1623; however, the majority neglects to note that the Commonwealth makes a significant direct contribution by reimbursement to the county from the state treasury to defray those expenses, and in addition pays directly all judicial salaries.[1]

Relying upon Webster's Third New International Dictionary definition of the word "unify", the majority proceeds from this authoritative source to conclude that the second issue must be answered in the affirmative. The underlying premise of the majority's position is that Article V's mandate for a unified system requires that the General Assembly fund the entire system by direct appropriation from the general treasury. In reaching this result the majority ignores the distinction between the obligation to provide the funding and the discretion involved in determining an appropriate scheme of funding.

**1.** The legislature has provided for payment to the counties as reimbursement for these costs $10,000.00 per authorized judgeship. General Appropriations Act of 1986, Act No. 5–A, § 289. Since 1985 the General Assembly has directly funded the expense of the operation and maintenance of the three statewide appellate courts. 42 Pa.C.S. § 3703.

The majority ignores the fact that the county's taxing power is not separate and independent of the state's taxing power. Rather, the authority to tax is a power of the state which is delegated by the state to the counties to be exercised by them in accordance with the terms of that delegation. *Mastrangelo v. Buckley*, 433 Pa. 352, 250 A.2d 447 (1969); *Fischer v. City of Pittsburgh*, 383 Pa. 138, 118 A.2d 157 (1955); *Evans v. West Norriton Township*, 370 Pa. 150, 87 A.2d 474 (1952); *Wilson v. School District of Philadelphia*, 328 Pa. 225, 195 A. 90 (1937). Thus, the present funding system for courts of common pleas is, in effect, simply an exercise by the state of its own taxing power through the counties in order to maintain that particular segment of the Unified Judicial System. The mere delegation of the state's taxing powers to the counties where the courts of common pleas are physically located and functioning is in no way incompatible with the Unified Judicial System set forth in Article V, Section 1.

The mandate for a Unified Judicial System requires the state to provide for the funding of that system, but this mandate cannot be construed as directing the method by which that financing must be accomplished. Such a judgment is the prerogative of the appropriating body, and that judgment cannot properly be intruded upon by a separate branch of government, *Beckert v. Warren*, 497 Pa. 137, 439 A.2d 638 (1981); *Leahey v. Farrell*, 362 Pa. 52, 66 A.2d 577 (1949); *Commonwealth ex rel. Schnader v. Liveright*, 308 Pa. 35, 161 A. 697 (1932). Thus the Commonwealth Court responsibly rejected this claim in concluding that the issue raised was non-justiciable because of: (1) the textually demonstrable constitutional commitment of the issue to a coordinate governmental branch, and (2) the impossibility of an appropriate judicial remedy. 93 Pa.Comwlth. 112, 500 A.2d 1267 (1985). Confirmation of the latter conclusion of the Commonwealth Court is manifested by the majority's attempt to fashion a mandate in the instant matter.

The majority in its effort to manipulate the facts of this lawsuit to justify its intrusion upon the discretion of its

sister branch completely ignores that we are not here faced with a complaint by a member of the unified court system of inadequate funding. To the contrary, under the facts of this case we have a political subdivision of the Commonwealth complaining as to the burden placed upon it by its parent. The conferrence upon the county of the right to exercise a portion of the state's taxing power carries with it the concomitant responsibility to use the funds generated therefrom for the purposes designated by the state. *See United Tavern Owners of Philadelphia v. School District of Philadelphia*, 441 Pa. 274, 272 A.2d 868 (1971); *County of Chester v. Philadelphia Electric Company*, 420 Pa. 422, 218 A.2d 331 (1966); *School District of Philadelphia v. Zoning Board of Adjustment*, 417 Pa. 277, 207 A.2d 864 (1965). Since the county has no independent authority to tax, it has no right to complain as to the purposes for which the resulting funds are to be directed.

The most transparently fallacious argument raised by the majority is the contention that the interjection of the county into the financing scheme has created an air of dissension that is incompatible with the concept of a *unified* system. While occasional disputes between the judges of a court of common pleas and county commisioners have given rise to litigation, in each case the particular problem has been resolved. In most of those cases the disputes resulted from uncertainties as to the relationship between the parties. *See, e.g., Pennsylvania Labor Relations Board v. AFSCME, District 84*, 515 Pa. 23, 526 A.2d 769 (1987). Our decisions in those matters have been primarily instructive, clarifying the parameters of an effective on-going relationship. *See, e.g., Ellenbogen v. County of Allegheny*, 479 Pa. 429, 388 A.2d 730 (1978); *Commonwealth ex rel. Bradley v. Pennsylvania Labor Relations Board*, 479 Pa. 440, 388 A.2d 736 (1978); *Sweet v. Pennsylvania Labor Relations Board*, 479 Pa. 449, 388 A.2d 740 (1978); *Board of Judges, Court of Common Pleas of Bucks County, Seventh Judicial District, v. Bucks County Commissioners*, 479 Pa. 457, 388 A.2d 744 (1978). Thus, it is inaccurate to contend that the differences brought to light and resolved in those

isolated lawsuits establish the existence of an irreconcilable state-wide breakdown of the local funding process. Moreover, it is ludicrous to suggest that direct state funding will eliminate disputes over appropriations. The nature of the relationship between an appropriating body, whether it be the county commissioners or the General Assembly, and the would-be recipient of funds renders some degree of disagreement inevitable. It would be unrealistic to suggest that direct funding for the courts of common pleas will provide a more harmonious process.

The underlying public policy in the area of public employment in this Commonwealth has been to establish and maintain a harmonious relationship between the public employer and the public employee.[2] It must be emphasized that the public policy in furthering the harmonious relationship between public employer and public employee is not here involved. In fact the judicial system has been unique in avoiding the disruptive disputes that so frequently plague other areas of public employment (e.g., the teachers strikes) and the private sector. The instant dispute is nothing more than an instrumentality of the sovereign attempting to challenge the judgment of that sovereign. In my judgment such a controversy clearly does not justify the unprecedented response that the majority today is willing to bestow.

Implicit in the majority's holding is the unstated judgment that direct funding would provide a greater benefit to the operation and maintenance of the system than the present system supplies. In addition to the fact that this is not a judgment to be made by the judicial branch, the validity of that assumption is far from clear. This state is unique in its economic diversity. The cost of living varies significantly throughout the state. Presently, the salaries paid through local funding are based upon the cost of living

**2.** Act 111, Act of June 24, 1968, P.L. 237, No. 111, 43 P.S. § 217.1 *et seq.* Act 195, Public Employe Relations Act, Act of July 23, 1970, P.L. 563, No. 195, 43 P.S. § 1101.101 *et seq.*

within that area.[3] Any effort to standardize salaries according to function to accommodate the suggested direct funding would greatly inflate the present cost of operation without assuring any enhancement in the quality of the services rendered. To accommodate those areas with a higher cost of living to assure the ability to attract competent personnel will result in raising the cost in other areas far beyond what would be necessary to find competent help in the latter areas. Conversely, any effort to set the rates based upon the economy of areas having a lower cost of living or attempting to seek a medium between two extremes would render it impossible for those areas at the top of the economic scale to obtain competent staffing. Since these areas are the most populous, with the heaviest case loads, such a result would be disastrous.

The utilization of the delegated taxing power of the counties in financing the functioning of the local court systems has proven helpful in insulating the judiciary from direct involvement in labor disputes with their employees. This salutory effect of the present relationship is evidenced by the fact that since the passage of Act 195,[4] there has not been a strike of any group of court employees. Again, it is to be noted that the instant complaint is not being made by court employees, nor is there a complaint against the judges. The squabble is between the county and its parent as to the former's responsibilities in this area.

Thus, I am constrained to conclude that the constitutional challenge raised herein is totally without merit. Moreover, even if we enjoyed the prerogative of questioning the wisdom of the General Assembly's financing scheme, which we do not, I cannot agree with the view that direct funding

3. The Office of the State Court Administrator estimates that the operating expenditures for the fiscal year 1987–88 will be $369,487,-174.00. The amount appropriated from the state treasury is approximately 130 million dollars. The difference is presently paid through county funding.

4. The Public Employe Relations Act, Act of July 23, 1970, P.L. 563, No. 195, *as amended,* 43 P.S. § 1101.101 *et seq.*

will necessarily improve the functioning of our present system.

I therefore must register my dissent.

McDERMOTT, J., joins in this dissenting opinion.

PAPADAKOS, Justice, dissenting.

I believe that in the spirit of comity among equal branches of government that the Applications of the Governor and the General Assembly of the Commonwealth of Pennsylvania should be granted and we should permit them to argue their positions (in Harrisburg) vis-a-vis the Constitutional argument that they provide full funding for the entire unified Judicial System of Pennsylvania.

NIX, C.J., and McDERMOTT, J., join this dissent.