545 Pa. 324 (1996)
681 A.2d 699
PENNSYLVANIA STATE ASSOCIATION OF COUNTY COMMISSIONERS, County of Allegheny, County of Bucks, County of Cumberland, County of Dauphin, County of Erie, County of Forest, County of Fulton, County of Monroe, County of Snyder, County of Tioga, Petitioners,
v.
COMMONWEALTH of Pennsylvania; Commonwealth of Pennsylvania, General Assembly; Mark S. Schweiker in his Official Capacity as President Pro-Tempore of the Pennsylvania Senate and Matthew J. Ryan in his Official Capacity as Speaker of the House of Representatives, Respondents.[1]
Supreme Court of Pennsylvania.
Submitted September 30, 1994.
Decided July 26, 1996.
*326 Robert L. Knupp, Harrisburg, Douglas E. Hill, Executive Director, Pennsylvania State Association of City Commissioners, Anthony T. McBeth, Harrisburg, for Petitioners.
Ernest D. Preate, Jr., Attorney General, Gregory Neuhauser, Senior Deputy Attorney General, for Respondents.
C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, for Pennsylvania General Assembly, Mark S. Singel & H. William DeWeese.
Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

ORDER
PER CURIAM.
In furtherance of the decision entered in Pennsylvania State Association of County Commissioners, et al. v. Commonwealth of Pennsylvania, et al., it is hereby ordered
1. Senior Judge (former Justice) Frank J. Montemuro, Jr. is appointed as the master to prepare recommendations to the *327 Supreme Court as to the implementation of a unified judicial system.
2. In order to assist him in the performance of this responsibility, Senior Judge Montemuro is authorized to employ such staff as may be reasonable and necessary.
3. Senior Judge Montemuro is to undertake consideration of the following matters. The following description is intended as a guideline only and is not a limitation upon the authority of Senior Judge Montemuro in fulfilling his responsibilities as master. Senior Judge Montemuro is directed to make recommendations regarding
A. identification of the parameters of the court-related offices and personnel included in the unified judicial system;
B. establishment of a single statewide judicial personnel system for all employees;
C. financial review of the unified judicial system, including but not limited to review if necessary of audits of existing resources, purchasing policies, existing contracts, and assessment of court-related facilities throughout the state;
D. standardization of a financial reporting system, accounting for expenditures, and uniform budget system;
E. standardization and unification of computer hardware, operating software, and programming;
F. allocation of judicial resources, including personnel, technological resources, and capital investments; and
G. such other matters deemed necessary for implementation of this Court's decision.
4. Senior Judge Montemuro is directed to prepare and submit an interim report regarding the progress of his undertaking no later than six months from the date of this order. Jurisdiction is retained.
CAPPY, J., did not participate in this Order.

*328 OPINION OF THE COURT

FLAHERTY, Justice.
In 1987 this court held that the statutory scheme for county funding of the judicial system of Pennsylvania was unconstitutional pursuant to Article 5, Section 1 of the Pennsylvania Constitution. County of Allegheny v. Commonwealth of Pennsylvania, 517 Pa. 65, 534 A.2d 760 (1987)(Allegheny County II). However, because we were mindful not only of our duty to interpret and give effect to the Pennsylvania Constitution, but also of our duty to act in cooperation with the General Assembly, a coordinate branch of government, we stayed our judgment in order to give the General Assembly an opportunity to enact funding legislation which would cure the constitutional defect. We left in place the system of county funding until this new legislation was implemented. That was nine years ago. At this writing, the General Assembly has not enacted an alternate system of funding the courts of Pennsylvania. The Pennsylvania State Association of County Commissioners and ten counties (hereinafter "the Counties") now bring this action in mandamus pursuant to an application for this court to exercise its original jurisdiction to compel the General Assembly to abide by the order in Allegheny County II, requiring a state scheme of funding the courts of Pennsylvania. For the reasons that follow, we grant the petition for mandamus and order that the General Assembly enact a funding scheme for the court system on or before January 1, 1998.
The Commonwealth of Pennsylvania, the General Assembly, the former President of the Senate, Mark S. Singel, and the former Speaker of the House, H. William DeWeese[2] (hereinafter "the Commonwealth") argue that mandamus is not available to petitioners; that the "speech and debate clause" of the Pennsylvania Constitution shields the legislative branch from this court's authority; that this court's denial of nearly identical *329 prior petitions requires denial of this petition; and that a similar case is pending, barring this case from proceeding.
The Counties assert that original jurisdiction for this mandamus action is conferred by 42 Pa.C.S. § 721(2), which provides:
The Supreme Court shall have original but not exclusive jurisdiction of all cases of:
(1) Habeas corpus.
(2) Mandamus or prohibition to courts of inferior jurisdiction.
(3) Quo Warranto as to any officer of Statewide jurisdiction.
The Commonwealth argues that this court has no jurisdiction pursuant to § 721 because a mandamus action applies only to matters within the original jurisdiction of the court, Pa.R.A.P. 3307, and this case does not fall within this court's original jurisdiction because this case does not involve mandamus to a court of inferior jurisdiction.
We agree that the plain meaning of § 721 excludes jurisdiction in this court in a mandamus action directed at the General Assembly. We disagree, however, that the petition must be dismissed for lack of jurisdiction. 42 Pa.C.S. § 726 provides:
Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or district justice of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.
This is a matter of immediate public importance, and pursuant to § 726 we assume jurisdiction.
Petitioner's action is in mandamus. In County of Allegheny v. Commonwealth of Pennsylvania, 507 Pa. 360, 372-73, 490 A.2d 402, 408 (1985)(Allegheny County I), we stated:

*330 Mandamus is an extraordinary remedy designed to compel official performance of a ministerial act or mandatory duty where there exists a clear legal right in the plaintiff, a corresponding duty in the defendant and want of any other adequate remedy at law. . . . Where the action sought to be compelled is discretionary, mandamus will not lie to control that discretionary act, . . . but courts will review the exercise of the actor's discretion where it is arbitrary or fraudulently exercised or is based upon a mistaken view of the law.
(Citations omitted.) Since the gravamen of the complaint is that petitioners seek to compel the official performance of a ministerial act or mandatory duty and that there is no other remedy at law, it is apparent that the complaint sounds in mandamus. It is equally apparent that the General Assembly has a mandatory duty to fund the state courts and that petitioners have no other remedy at law.
The Commonwealth claims, however, that the doctrine of separation of powers which is stated in the "speech or debate clause" of the Pennsylvania Constitution prohibits this action against the General Assembly. The speech or debate clause provides that "for any speech or debate in either House, [the legislators] shall not be questioned in any other place." Pa. Const. Art. II, § 15. The Commonwealth's view of this clause is that it insulates legislators not only from controversies over legislation which it has passed, but also over the legislature's allegedly "contumacious conduct." Brief at 14.
In Consumers Association v. Nolan, 470 Pa. 372, 382, 368 A.2d 675, 680-81 (1977), we addressed the speech and debate clause of the Pennsylvania Constitution and noted that it is essentially identical to a comparable clause in the United States Constitution, the scope of which has been interpreted in federal cases:
[T]he Supreme Court of the United States recently held that the federal Speech and Debate Clause must be interpreted broadly in order to protect legislators from judicial interference with their legitimate legislative activities, and that even where the activity questioned is not literally *331 speech or debate, a court must determine if it falls within the "legitimate legislative sphere"; if it does, the action against the legislator calling it into question, whether criminal or civil, must be dismissed.
A lawsuit to compel legislative action normally would be barred by the speech and debate clause. Litigants may not sue in court to compel the legislature to enact a law.
In this case, however, where the legislature has been directed by this court to act in order to remedy a constitutional defect in the scheme which funds the court system, funding of which is necessary for the continued existence of the judicial branch of government, the legislature is not insulated from suit by the speech and debate clause. If it were, this court's duty to interpret and enforce the Pennsylvania Constitution would be abrogated, thus rendering ineffective the tripartite system of government which lies at the basis of our constitution. As this court stated in Beckert v. Warren:
A basic precept of our form of government is that the executive, the legislature and the judiciary are independent, co-equal branches of government. . . .
The allocation of these governmental powers to three distinct branches averts the danger inherent in the concentration of absolute power in a single body. . . .
However, the separation of powers would not achieve this prophylactic effect unless it also prevented one branch from usurping the powers committed to the other branches of government. The crucial function of the separation of powers principle, therefore, is not separation per se, but the "checking" power each branch has over the others. . . .
Thus, while the judicial power is vested exclusively in the courts, the taxing and spending powers necessary to sustain the existence of the judiciary is vested in the legislature. As we explained in Leahey v. Farrell, . . .:
Control of state finances rests with the legislature, subject only to constitutional limitations. . . . Under the system of division of governmental powers it frequently happens that the functions of one branch may overlap *332 another. But the successful and efficient administration of government assumes that each branch will cooperate with the others. . . .
Should Commissioners, however, neglect or refuse to furnish funds, or sufficient funds, for reasonable judicial functions, and in consequence the efficient administration of the judicial branch of the government is thereby impaired or destroyed, the courts possess the inherent power to require such necessities to be furnished and to direct payment therefor out of the public treasury. . . .
Absent such inherent power, the judiciary whose existence is mandated by Article 5 of the Pennsylvania Constitution, could be destroyed by the legislature:
Mr. Chief Justice Marshall said in McCulloch v. Maryland, 17 U.S. 316, 431 [4 Wheat. 316, 4 L.Ed. 579] ". . . the power to tax involves the power to destroy; . . ." A Legislature has the power of life and death over all the Courts and over the entire Judicial system. Unless the Legislature can be compelled by the Courts to provide the money which is reasonably necessary for the proper functioning and administration of the Courts, our entire Judicial system could be extirpated, and the Legislature could make a mockery of our form of Government with its three co-equal branches  the Executive, the Legislative and the Judicial.
It follows, therefore, that since the destruction of one branch of government by another would be antithetical to the constitutional scheme of separation of powers, any legislative action which impairs the independence of the judiciary in its exercise of the judicial power and the administration of justice would be similarly abhorrent.
497 Pa. 137, 144-47, 439 A.2d 638, 642-43 (1981) (Citations omitted.) In this case as in Beckert, although the constitutional threat takes a different form, at issue is the continued existence of an independent judiciary. The Speech and Debate clause does not insulate the legislature from this court's authority to require the legislative branch to act in accord with the Constitution.
*333 The Commonwealth also asserts that the present action is barred by principles of lis alibi pendens, res judicata and collateral estoppel in that prior similar actions have been filed and rejected by this court. Suffice it to say that at this time, no other actions are pending, that in prior actions there has not been an identity of parties and that the relief sought in prior actions has not been identical to the relief sought in this action. Thus, neither res judicata, nor collateral estoppel, nor lis alibi pendens may serve to bar the present action.[3]
Because this court has attempted to act cooperatively with the General Assembly and has denied prior petitions for enforcement, allowing the General Assembly a period of nine years to enact a funding scheme which would provide the necessary financial support for state courts, and because the General Assembly has failed to act within this extended reasonable period of time, we now grant petitioner's request for a writ of mandamus. Pursuant to this writ, jurisdiction is retained and by further order a master will be appointed to recommend to this court a schema which will form the basis for the specific implementation to be ordered.
NEWMAN, J., files a concurring opinion.
NIX, C.J., files a dissenting opinion in which CASTILLE, J., joins.
CASTILLE, J., files a dissenting opinion in which NIX, C.J., joins.
NEWMAN, Justice, concurring.
In County of Allegheny v. Commonwealth of Pennsylvania, 517 Pa. 65, 534 A.2d 760 (1987) (Allegheny II), this Court held that statutes providing for county funding of the courts conflict with Article 5, Section 1 of the Pennsylvania Constitution, which states:

*334 The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.
It is well settled that courts should not declare statutes unconstitutional except in the most limited circumstances. This Court noted in Pennsylvania Liquor Control Board v. The Spa Athletic Club, 506 Pa. 364, 370, 485 A.2d 732, 735 (1984):
The strong presumption of constitutionality enjoyed by acts of the General Assembly and the heavy burden of persuasion on the party challenging an act have been so often stated as to now be axiomatic. Legislation will not be invalidated unless it clearly, palpably, and plainly violates the Constitution, and any doubts are to be resolved in favor of a finding of constitutionality.
This Court in Allegheny II concluded that "the statutory scheme for county funding of the judicial system is in conflict with the intent clearly expressed in the constitution that the judicial system be unified." Id. at 75, 534 A.2d at 765. While the Constitution clearly requires a unified judicial system, I question whether Allegheny II established that county funding so violates a unified judicial system that the legislation had to be stricken. Although this Court in Allegheny II emphasized that disagreements between the county governments and the judicial branch have created a relationship that is "neither harmonious nor unified," the Court, to me, did not satisfactorily explain why funding from a single source, the state legislature, is more likely to create harmony and unity than funding from county sources.
Allegheny II cites three cases in support of the position that disagreements over funding between the judicial districts and the counties created such strife that they threatened the unity *335 of the judicial system.[1] In Leahey v. Farrell, 362 Pa. 52, 66 A.2d 577 (1949), the judges of the Court of Common Pleas of Cambria County entered an order against the County requiring it to raise the compensation of court stenographers. This Court reversed on the basis that before issuing a mandamus order, Section 23 Act of July 5, 1947. P.L. 1308, 16 P.S. § 304 obligated the judges to submit a request for increases to the salary board. They never made such a request. The Court stated that:
It became the duty of the court to comply first with the statutory provisions and to make known to the board its reasonable requirements. It is only when a board acts arbitrarily or capriciously and refuses or neglects to comply with the reasonably necessary requirements of the court, whereby the administration of justice may be impaired or destroyed, that under the inherent power of the court, orders like that now complained of may be enforced by mandamus.
Id. at 60, 66 A.2d at 580.
Leahey stands for the proposition that when the legislature fails to provide sufficient funding for the administration of the courts, the judiciary has the power to direct such payment. However, nothing in the case suggests that the state legislature rather than a county legislative body is more appropriate for making initial fiscal determinations regarding the courts. I also note that in Leahey, it was not the legislature, but the court that failed to act harmoniously with a coequal branch of government by issuing an order increasing the salary of certain employees without seeking the approval of the salary board.
Allegheny II also cites Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193 (plurality opinion), cert. denied sub nom. Tate v. Pennsylvania ex rel. Jamieson, 402 U.S. 974, *336 91 S.Ct. 1665, 29 L.Ed.2d 138 (1971), as an example of strife regarding county funding of the courts. There, the judges of the Court of Common Pleas of Philadelphia brought an action to compel the Mayor and City Council to provide additional funding for the administration of the Court for the fiscal year beginning July 1, 1970. This Court designated Judge Harry M. Montgomery of the Superior Court to hear the case. Judge Montgomery ordered the defendants to appropriate $2,458,000.00 to the Court, which included, inter alia, additional funding for adult probation, attorney fees, data processing and arbitration fees. This Court affirmed Judge Montgomery's decision and agreed with his conclusion that the funding approved by City Council was inadequate to meet the reasonable needs of the Courts of Common of Common Pleas.[2]
Clearly the importance of Carroll lies not in the fact that disagreement existed between City Council and the courts, but that it reaffirmed the principle that despite the separation of powers, the courts have the inherent power to compel the legislature to "provide the money which is reasonably necessary for the proper functioning of the Courts. . . ." Id. at 57, 274 A.2d at 199.
In Beckert v. Warren, 497 Pa. 137, 439 A.2d 638 (1981), also cited by Allegheny II as an example of contention between the county courts and the legislature, the judges of the Bucks County Court of Common Pleas sought a writ of mandamus compelling the County Commissioners and the Salary Board to comply with their budget requests. This Court assumed plenary jurisdiction of the action and remanded the matter to Commonwealth Court, where Judge David W. Craig was appointed to hear expedited argument. Judge Craig determined that the Court of Common Pleas had established the need for certain new positions for "necessary judicial functions." Beckert at 142, 439 A.2d at 641. Judge Craig also determined that the Court of Common Pleas met its burden of *337 establishing that "efficient judicial administration requires" certain existing positions and the addition of specific additional positions. Id. Furthermore, Judge Craig found that the Court of Common Pleas did not meet its burden of establishing that "efficient judicial administration requires" certain additional positions, including a conference officer, two tipstaves and two stenographers. Id. This Court affirmed Judge Craig's findings, and ordered the County Commissioners and Salary Board to fund the positions. Relying on Leahey and Carroll, this Court noted that the courts have the power to require the legislature to provide for reasonably necessary expenditures. This court defined a "reasonably necessary expenditure" as one that "enables the judiciary to fulfill its responsibilities and furthers the administration of justice." Beckert at 154, 439 A.2d at 647.
The fundamental principle that we glean from Leahey, Carroll and Beckert is that although the separation of powers is the basis of our form of government, when the legislature through fiscal control of the judiciary impedes the administration of justice, the courts may exercise the extraordinary measure of requiring the legislature to provide funding for specific purposes.[3] While I agree with this principle, I believe that the majority in Allegheny II and in the instant case have relied on it inappropriately regarding the broader issue of whether the courts being funded by the counties rather than by the state is unconstitutional. The fact that the courts may exercise the power to require funding for specific employees or projects necessary for the administration of justice does not imply that the courts may strike down an entire system of court funding legislation. I note that even if the state were responsible for total funding of the courts, the principles set forth in Leahey, Carroll and Beckert would permit the judiciary to require the state to make specific appropriations where the administration of justice was threatened.
*338 Allegheny II holds county funding legislation unconstitutional because it conflicts with Webster's Third Dictionary's definition of "unify." The lack of a precise definition for the term "unified judicial system" leads me to conclude that an insufficient basis existed upon which this Court could determine that the statutory provisions for county funding of the courts clearly, palpably and plainly violate the Constitution.
In Allegheny II this Court acted appropriately in staying its judgment to allow the General Assembly the opportunity to enact new legislation, recognizing the same approach was used by the United States Supreme Court in Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion). In Northern Pipeline, the Supreme Court determined that the Bankruptcy Reform Act of 1978 was flawed because it violates Article III of the U.S. Constitution. The Bankruptcy Act of 1978 (Act) established the then current United States Bankruptcy Court structure as an adjunct to the U.S. District Courts. The Northern Pipeline Construction Company, a debtor in the midst of a Chapter 11 bankruptcy reorganization, brought a contract action against Marathon, a creditor, in a Bankruptcy Court established by the Act. Marathon brought a motion to dismiss the suit since the Act unconstitutionally conferred Article III judicial power upon judges and courts created under Article I legislative authority. The Bankruptcy Court denied the motion. On appeal, the District Court for the District of Minnesota granted the motion to dismiss. Both the debtor and the United States (who intervened to defend the validity of the Act) appealed to the United States Supreme Court. In a plurality opinion, the Court affirmed the district court's order, ruling that the Act was unconstitutional. However, the Supreme Court's order delayed its judgment for approximately ninety days, providing, in relevant part, the following:
The judgment of the district court is affirmed. However, we stay our judgment until October 4, 1982. This limited stay will afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, *339 without impairing the interim administration of the bankruptcy laws.

Id. at 88, 102 S.Ct. at 2880 (emphasis added). In Northern Pipeline, Congress established a set of emergency rules almost immediately upon application. The Supreme Court continued the stay until two years later when Congress adopted the 1984 Amendments to the Bankruptcy Code.
Substantively, Northern Pipeline does not support the proposition that county funding of the courts violates the Pennsylvania Constitution's requirement of a unified judicial system. In fact, I could find no case showing that a court can specifically order a legislative body to enact a comprehensive system of court funding. Nevertheless, Northern Pipeline supports the decision in Allegheny II to stay a judgment in order to allow the General Assembly the opportunity to enact constitutional legislation.
Despite my reservations, I recognize that the rule of stare decisis[4] requires that we apply the holding of Allegheny II to the case before us. Accordingly, I agree with the majority's decision in the instant matter to issue a writ of mandamus, but I acknowledge that such action raises concern about violations of the Speech or Debate Clause.
Article 2, Section 15 of the Pennsylvania Constitution provides that "for any speech or debate in either House, [the legislators] shall not be questioned in any other place." This provision is identical to Article 1, Section 6 of the federal Constitution. In Consumers Education and Protective Association *340 v. Nolan, 470 Pa. 372, 382, 368 A.2d 675, 681 (1977), we held that:
Even where the activity questioned is not literally speech or debate, a court must determine if it falls within the `legitimate legislative sphere'; if it does, the action against the legislator calling it into question, whether criminal or civil, must be dismissed.
While recognizing that the Speech or Debate Clause normally bars actions to compel legislative action, the majority holds that "where the legislature has been directed by this court to remedy a constitutional defect in the scheme which funds the court system, funding of which is necessary for the continued existence of the judicial branch of government, the legislature is not insulated by the speech and debate clause." (Majority Opinion at 331). Because funding of the courts "falls within the `legitimate legislative sphere'" I acknowledge the Respondents' concern that the mandamus order violates the Speech or Debate Clause. However, because we are bound by Allegheny II, which found the current funding system to be a threat to the judiciary, and because the General Assembly has failed to act within the past eight years, I believe that issuing an order of mandamus is appropriate for this Court, and we should appoint a master to make recommendations regarding methods of funding the state courts.
It is my opinion that Allegheny II was decided without the benefit of a thorough study documenting the nature and extent of problems arising from county funding of the courts. This Court's 1987 order clearly gave no direction to the legislature regarding state funding. To ensure that the master gives this Court a solid basis "for the specific implementation to be ordered" (Majority Opinion at 333), I would charge the master to make findings of fact and conclusions regarding, but not limited to the matters that follow:
With respect to the current method of funding, the master will study (1) sources of county funding;, (2) the methods by which the counties distribute these funds; (3) the ways in which sources and distribution of funds differ between the *341 counties; and (4) the amount of funding each county court system has sought and actually received in the past five years. We should also charge the Master with analyzing all court challenges to county funding for the past five years.
With respect to state funding of the courts, the master should be charged with (1) examining existing statewide funding schemes in other jurisdictions, (2) studying possible sources of state funding; (3) clarifying how the distribution of state funds would differ from the current system; and (4) analyzing the ways in which statewide funding would relieve the alleged problems that exist under the current system.
Within one year of appointment, the Master should complete a study of the issues outlined above, and make recommendations to the Court. A comprehensive Master's report will serve as a solid foundation as this Court guides the legislature toward the creation of unified funding for our unified judicial system.
NIX, Chief Justice, dissenting.
For the reasons set forth in my dissenting opinion in County of Allegheny v. Commonwealth, 517 Pa. 65, 76, 534 A.2d 760, 765 (1987) (Nix, C.J., dissenting), I must disassociate myself from this latest attempt by the majority to transgress the boundaries of a co-equal branch of government.
In registering my dissent today, I decline to engage in a subjective determination of whether I believe the judicial system will be better served under a direct state funded system as opposed to a county funded system. Instead, I believe that absent a direct challenge to the adequacy of funding, this Court lacks the authority to dictate to another co-equal branch of government the means to be employed in resolving this dispute. By doing so, the majority's actions today amount to nothing more than an unjustified intrusion into an area which is solely within the discretion of the General Assembly.
*342 Accordingly, I emphatically dissent. In addition, I also join the dissenting opinion authored by CASTILLE, J.
CASTILLE, J., joins in this dissenting opinion.
CASTILLE, Justice, dissenting.
Article 5, Section 1 of the Pennsylvania Constitution provides that:
[T]he judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified system.
In County of Allegheny v. Commonwealth of Pennsylvania, 517 Pa. 65, 534 A.2d 760 (1987) (Allegheny County II), a majority of this Court held that although the language of Article 5, Section 1 does not specify the manner in which the courts are to be funded, the constitution's requirement that the judicial system be unified nevertheless inherently requires that the Commonwealth assume all responsibility for funding of the unified judicial system. Accordingly, that Court held that the then existing statutes delegating certain funding responsibilities to the counties for maintenance of their respective courts of common pleas was unconstitutional, and instead imposed upon the General Assembly the responsibility to enact a funding scheme to fund all courts, including the county courts for which county funding schemes were already in place.[1]
In his dissent in Allegheny County II, Mr. Chief Justice Nix noted that Article 5, Section 1 is utterly devoid of any language *343 that requires the state to directly fund the entire unified judicial system. He further noted that the majority, in reaching its result, ignored "the distinction between the obligation to provide the funding and the discretion involved in determining an appropriate scheme of funding." 534 A.2d at 766.
I agree with Mr. Chief Justice Nix's dissent in Allegheny County II. The constitutional obligation that Pennsylvania must have a unified judicial system in no manner implicates the Commonwealth's inherent ability to determine how funds to support such a system can be raised and allocated for support of the court system. I believe that the constitutional mandate for a unified judicial court system is satisfied when the lines of authority flow from the Supreme Court to the local courts and where the high court thereby possesses administrative responsibility over those lower courts in the Pennsylvania court system.[2] Such an arrangement presently exists and satisfies the mandates of Article 5.
*344 As Justice Antonin Scalia of the United States Supreme Court recently noted in Plaut v. Spendthrift Farm, Inc., ___ U.S. ___, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), our tripartite form of government recognizes:
"[t]he necessity of distinct and separate existence of the three great departments of government . . . [that] had been proclaimed and enforced by . . . Blackstone, Jefferson and Madison and had been sanctioned by the people of the United States, by being adopted in terms more or less explicit, into all written constitutions."
___ U.S. at ___, 115 S.Ct. at 1455, quoting Bates v. Kimball, 2 Chipman 77, 84 (Vt.1824). In our Commonwealth, it has always been the province of the legislative branch to enact legislation to raise revenue to support the sister branches.[3] Inherent in this duty is a corresponding responsibility to assure the proper and efficient expenditure of the revenue raised. The result reached by the majority opinion would eliminate the legislative branch's responsibility for enacting legislation that properly raises and efficiently expends revenue and would transfer this expenditure responsibility totally to the judicial branch, thus eliminating a vital check and balance between these two co-equal branches of the government. Such usurpation of authority provides the judicial branch with unfettered power to spend revenue as it sees fit in the name of a unified judicial system without being directly answerable to the source of the revenue, the citizens, if such revenue is not spent wisely or efficiently. Such an egregious action drastically upsets the checks and balances of our scheme of government. As James Madison stated in the Federalist Papers when commenting on the need for the separation of powers: "[T]he accumulation of all powers, legislative, executive and *345 judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 301 (J.Madison) (C. Rossiter ed.1961). The fact that there may be, as the majority noted in Allegheny County II, "continual friction and dissention" between the taxing authority and the various courts of the counties in this Commonwealth is merely a recognition of the delicate balancing of power within our system of government with its concomitant checks on the power of sister branches by each branch. However, this inherent tension hardly warrants this Court's wholesale elimination of the statutorily-enacted funding scheme whereby individual counties are responsible for the funding of their respective county court systems. Neither does it warrant this Court assuming the power unto itself to determine the funding level of the unified judicial system and then unilaterally imposing that determination on the legislative branch, thereby eliminating an important check on the judicial branch by the legislative branch. This is the very definition of judicial tyranny.
The concurring opinion illustrates eloquently the few instances of "continual friction and dissention" between the judicial branch and the funding source. Certainly, these few instances do not give support to the majority's conclusion of continued friction and dissent. But, even though the author of the concurring opinion expresses misgivings over the propriety of the majority's decision, the author invokes the doctrine of stare decisis as a basis for the concurrence in the majority's decision. I recognize that the doctrine of stare decisis mandates that great consideration be accorded to established precedent. The doctrine of stare decisis, however, "is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice." Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 406, 388 A.2d 709, 720 (1978). As this Court has stated,
While it is true that great consideration should be accorded precedent, especially one of long standing and general acceptance, it doesn't necessarily follow that a rule merely *346 established by precedent is infallible. Moreover, the courts should not perpetrate error solely for the reason that a previous decision although erroneous, has been rendered on a given question. This is particularly true where no fixed rights of property are involved or where great injustice or injury will result by following the previous erroneous decision. If it is wrong it should not be continued. Judicial honesty dictates corrective action. As stated by this court in Commonwealth ex rel. Margiotti v. Lawrence, 326 Pa. 526 at 530 and 531, 193 A. 46 at 48 (1937), quoting, Cooley, Constitutional Limitations, (8th Ed.1927), Vol. 1, Page 120, `* * * when a question involving important public or private rights, extending through all coming time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right, but the duty, of the court, when properly called upon, to reexamine the questions involved, and again subject them to judicial scrutiny. We are by no means unmindful of the salutary tendency of the rule stare decisis, but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error and the advantage of review.'
Olin Mathieson Chemical Corp. v. White Cross Stores, Inc., No. 6, 414 Pa. 95, 100-01, 199 A.2d 266, 268-69 (1964). As previously discussed, a careful review of the Allegheny County II decision leads me to the conviction that it was erroneously decided and will serve a great injustice and that the rule of stare decisis should, in this instance, be abandoned.
Therefore, because I believe that the reasoning and result reached by the majority in Allegheny County II was in error, in that I agree with the dissent that there is no absolute obligation for the Commonwealth to directly fund the unified judicial system, I must dissent here from the majority opinion's order that a writ of mandamus be issued. Mandamus "is only appropriate to compel performance of a ministerial act or mandatory duty where there is a clear right in the petitioner to have the act performed . . . and a lack of any other appropriate and adequate remedy." Travis v. Teter, 370 Pa. *347 326, 87 A.2d 177, 179 (1952). Even this Court is less than unanimous in the proposition that the Pennsylvania Constitution requires a funding scheme whereby the state must directly fund the courts of common pleas. Accordingly, a writ of mandamus is inappropriate. I, therefore, must respectfully dissent.
NIX, C.J., joins in this dissenting opinion.
NOTES
[1] Pursuant to Pa.R.A.P. 502(c), the successors to the public officers named in the original caption have been substituted as parties.
[2] Messrs. Single and DeWeese were parties to the original action and have been replaced as parties by Messrs. Schweiker and Ryan. See n. 1. supra.
[3] On February 12, 1991, Allegheny County filed a motion to lift stay and enforce judgment. On April 23, 1991 this court denied the motion. PSACC filed a motion to enforce judgment on October 7, 1992. This motion was denied on May 26, 1993. There are no other pending motions.
[1] To a great extent, my reservations about Allegheny II stem from the fact that the Court does not provide complete data regarding the alleged history of strife regarding disputes between the judiciary and the counties. While references to three specific cases are helpful, I believe that a decision declaring a statutory scheme unconstitutional should be grounded on a complete factual record.
[2] The original award was based upon nine months remaining in the fiscal year. Because this Court issued its decision in February 1971, it reduced the award to $1,365,555.00 because only five months remained in the fiscal year.
[3] The principle set forth in Leahey, Carroll, and Beckert has been reaffirmed by this Court in Snyder v. Snyder, 533 Pa. 203, 620 A.2d 1133 (1993), and Lavelle v. Koch, 532 Pa. 631, 617 A.2d 319.
[4] Regarding the principle of stare decisis, the U.S. Supreme Court has stated:

With Cardozo, we recognize that no judicial system could do society's work if it eyed each issue afresh in every case that raised it. See B. Cardozo, The Nature of the Judicial Process 149 (1921). Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable. See Powell, Stare Decisis and Judicial Restraint, 1991 Journal of Supreme Court History 13, 16.
Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992) (plurality opinion).
[1] Prior to Allegheny County II, the counties were provided with certain taxing authority to raise revenue based upon its needs and operations. The specific statutes authorizing the counties to do so included: 42 Pa.C.S. §§ 2302, 3544, 3722 and 16 P.S. §§ 1623 and 4823. The Court, however, found these statutes unconstitutional, reasoning that they could cause "continual friction and dissention," which, it found, defeated the purpose of a unified judicial system.
[2] I believe that the history of the Constitutional Convention supports this position. Act No. 2 of 1967 authorized the Constitutional Convention that produced the present Article 5 of the Pennsylvania Constitution. Section 5 of Act No. 2 authorized the establishment of the Preparatory Committee for the Constitutional Convention. As part of its duties, the Preparatory Committee produced nine (9) reference manuals to give delegates general information on the Convention, to present a brief history of the several Pennsylvania Constitutions and to provide pertinent information concerning the subject matter and areas the delegates were authorized to consider. As part of the reference manual on the judiciary, the Preparatory Committee, when discussing the administration and costs of the judiciary, noted the existence of the present county funding scheme and the fact that some proponents of a unified judiciary are convinced that such a scheme would only work if all costs are borne by the state. Pennsylvania Constitutional Convention 1967-68, Ref. Manual No. 5, The Judiciary, Part VII, § 8 at 230. Despite being informed of the problems in funding, the delegates at the Constitutional Convention chose not to speak to this issue either in the Constitutional provision or in the debates concerning the unified judiciary. Because it appears that the delegates intentionally omitted the funding of the unified judiciary, I believe it was improper for the majority in Allegheny County II to supply such an omission. See Altieri v. Allentown Officers' & Employees' Retirement Board, 368 Pa. 176, 180-81, 81 A.2d 884, 886 (1951) (it is not for the courts to legislate or by interpretation to add to legislation matters which the legislature saw fit not to include).
[3] Throughout history, the dividing lines between the boundaries of power and our three separate co-equal branches of government have often been incapable of exact definition. Generally, the executive branch has the power to recommend legislation and the power and duty to see that the laws are faithfully administered and carried out. The legislative branch has the power and duty to pass legislation, and the judicial branch has the power, duty and responsibility of interpreting the legislation in order to determine if it violates the constitution. Stander v. Kelley, 433 Pa. 406, 250 A.2d 474 (1969).