# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Fulton, Fulton County Board : 
of Elections, Stuart L. Ulsh, in his : 
official capacity as County : 
Commissioner of Fulton County and : 
in his capacity as a resident, taxpayer : 
and elector in Fulton County, and Randy : 
H. Bunch, in his official capacity as : 
County Commissioner of Fulton County : 
and in his capacity as a resident, : 
taxpayer and elector of Fulton County, : 
                Petitioners : 
       v. :     No. 277 M.D. 2021 
       :     Argued: March 10, 2022 
Secretary of the Commonwealth, : 
            Respondent : 

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT          FILED: May 23, 2022

      The County of Fulton, the Fulton County Board of Elections, Stuart L. Ulsh (county commissioner, county board of elections commissioner, resident, taxpayer and elector), and Randy H. Bunch (county commissioner, county board of elections commissioner, resident, taxpayer and elector) (collectively, County) have filed an Amended Petition for Review (Amended Petition) against the Secretary of the Commonwealth (Secretary) to challenge her "decertification" of two electronic voting devices that the County has leased. The Secretary's stated reason for this action was that the County used a third-party consultant to inspect its electronic voting devices as part of the County's inquiry into its conduct of the 2020 General Election.

The County's Amended Petition has five counts. Count I asserts that the Secretary unlawfully decertified the County's two electronic voting devices. Count II asserts that the Pennsylvania Election Code (Election Code)[1] expressly authorized the County to inspect its electronic voting devices as part of its statutory duty to ensure the safe and honest conduct of elections in the County. Count III asserts that a directive of the Secretary, which, *inter alia*, prohibits all county boards of elections from inspecting their electronic voting devices with the assistance of a third-party consultant, violates Section 302 of the Election Code, 25 P.S. §2642. Count IV asserts that the Secretary unlawfully withheld funding from the County that it needs to acquire replacement electronic voting devices. Count V seeks injunctive relief to restore the *status quo* that existed prior to the Secretary's unlawful decertification of the County's electronic voting devices.

In response, the Secretary has filed a preliminary objection in the nature of a demurrer to Count III of the Amended Petition, *i.e.*, the challenge to the Secretary's directive prohibiting all county boards of elections from inspecting their electronic voting devices with the assistance of third-party consultants. The Secretary argues that Count III fails to state a claim because she had express statutory authority to issue this directive, and, further, the Amended Petition does not allege that she abused her discretion in issuing the challenged directive.

For the reasons set forth herein, we overrule the Secretary's demurrer to Count III. It cannot be said with certainty that the law will not allow the County to prevail on this claim.

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2600-3591.

## Background

In 2019, the Secretary[2] approved the Democracy Suite 5.5A electronic voting system produced by Dominion Voting Systems, Inc. (Dominion) for use in Pennsylvania. Amended Petition ¶14. In accordance with this approval, the County leased two Democracy Suite 5.5A electronic voting devices[3] from Dominion and used them, *inter alia*, for the 2020 General Election. *Id.* ¶¶19-20. Shortly after the 2020 General Election, the County contracted with Wake Technology Services Inc. (Wake TSI), "a private technology firm specializing in cyber security including in the field of voting technology" that "has extensive experience in working with governmental entities such as the United States (U.S.) Department of State and the Pennsylvania System of Higher Education." *Id.* ¶29. The County engaged Wake TSI to assess the County's conduct of the 2020 General Election.

In September of 2016, the Secretary issued the "Guidance on Electronic Voting System Preparation and Security" (2016 Guidance) that acknowledges the "use of third-party vendors for electronic voting system preparation and security" by counties and "strongly recommends" that a county's vendor follow the procedures set forth in the 2016 Guidance. Amended Petition ¶¶23-24. The 2016 Guidance

---

[2] Kathy Boockvar served as Secretary of the Commonwealth in 2019, when the certification first occurred. On February 5, 2021, Veronica Degraffenreid was appointed Acting Secretary of the Commonwealth. Leigh M. Chapman, the current Acting Secretary, was appointed February 8, 2022.

[3] The Amended Petition refers to the County's two electronic voting devices at issue in this case as "systems," Amended Petition ¶¶9, 19-20, 73, and also "machines," *id.* ¶48, and at 14, Wherefore Clause & n.1; *see also id.* ¶65 ("system and machine"). This opinion uses the word "system" to mean the Democracy Suite 5.5A technology, or other electronic voting technology, that was approved by the Secretary for use across the Commonwealth, and it uses the word "device" to mean particular equipment produced by a vendor of an electronic voting system certified by the Secretary. This usage is consistent with the terms "Electronic voting system" and "Voting device," which are terms defined in Section 1101-A of the Election Code, added by the Act of July 11, 1980, P.L. 600, 25 P.S. §3031.1.

3

specifically addresses "file transfers." *Id*. ¶25. On October 13, 2020, the Secretary issued another "Guidance on Electronic Voting System Preparation and Security" (2020 Guidance) that confirmed and updated the 2016 Guidance. *Id*. ¶27. In the course of Wake TSI's assessment, the County followed the 2016 and 2020 Guidances and "ensured that proper chain of custody of the equipment was maintained at all times through the presence of Fulton County's Election Director (Commissioners and other staff were also present), who was the sole individual to remove or replace ballots in the ballot carts." *Id*. ¶31. Wake TSI conducted its assessment "in a manner that was bi[]partisan and transparent." *Id*. ¶39.

Wake TSI's "assessment of Fulton County's election systems consisted of a review of operating and application system file dates, operating system and application log files, ballot images, and related files." Amended Petition ¶30. On February 29, 2021, Wake TSI issued a report concluding that the County conducted the 2020 General Election "in a diligent and effective manner and followed the directions of the Commonwealth[.]" *Id.* ¶32.

On July 8, 2021, several months after Wake TSI's inspection and report to the County, the Secretary issued "Directive 1 of 2021," which states, in relevant part, as follows:

> The following Directive is issued July 8, 2021, by the Secretary of the Commonwealth pursuant to authority contained at Section 1105-A(a) of the Pennsylvania Election Code, [added by the Act of July 11, 1980, P.L. 600,] 25 P.S. [§]3031.5(a).
>
> ***1. Background.*** The Secretary of the Commonwealth ("Secretary") has duties pursuant to Article XI-A of the Pennsylvania Election Code … to examine, evaluate and certify electronic voting systems. These reviews include verifying that the voting system conforms to federal and state law and any regulations or standards regarding confidentiality, security, accuracy, safety, reliability, usability, accessibility, durability,

4

resiliency, and auditability. This is in addition to the Federal testing and certification undertaken by the U.S. Election Assistance Commission.

* * *

*2. Third-Party Access to Electronic Voting Systems.* Demands have been made to allow third-party entities not directly involved with the conduct of elections to have access to electronic voting systems, specifically to review and copy the internal electronic, software, mechanical, logic, and related components of such systems…. Such access by third parties undermines chain of custody requirements and strict access limitations necessary to prevent both intentional and inadvertent tampering with electronic voting systems. It also jeopardizes the security and integrity of those systems and will negate the ability of electronic voting system vendors to affirmatively state that *such systems continue to meet Commonwealth security standards, are validated as not posing security risks, and are able to be certified to perform as designed by the electronic voting system vendor* and as certified by both the U.S. Election Assistance Commission and the Department of State.

*3. Limits on Third-Party Access to Electronic Voting Systems.* The following directive is effective immediately:

> a. *County Boards of Elections shall not provide physical, electronic, or internal access to third parties seeking to copy and/or conduct an examination of state-certified electronic voting systems, or any components of such systems,* including but not limited to: election management software and systems, tabulators, scanners, counters, automatic tabulating equipment, voting devices, servers, ballot marking devices, paper ballot or ballot card printers, portable memory media devices (thumb drives, flash drives and the like), and any other hardware, software or devices being used as part of the election management system.

b. *If access described in Paragraph 3.a. occurs*, those pieces of voting equipment will be considered no longer secure or reliable to use in subsequent elections. As a result, *the Department of State will withdraw the certification or use authority for those pieces of the county voting system.* This directive is specific to the impacted pieces of the county electronic voting system and does not impact the certification of the underlying voting system nor does it impact other pieces of a county's voting system that has not been accessed/copied by a third-party.

c. The Commonwealth of Pennsylvania will not reimburse any cost of replacement voting equipment for which certification or use authority has been withdrawn pursuant to this directive.

Original Petition for Review, Ex. F (emphasis added).[4]

On July 20, 2021, shortly after the issuance of Directive 1 of 2021, the Secretary notified the County by letter that, effective immediately, she was "decertifying" the County's two Democracy Suite 5.5A electronic voting devices. Amended Petition ¶37. The Secretary's letter stated that this decertification was prompted by Wake TSI's examination of the County's voting devices, which had "compromised" the two devices. *Id.* The County contends that the Secretary's decertification was "arbitrary, capricious, and an error of law" because she took this action without a reexamination of the two voting devices to determine whether they

_____

[4] The Amended Petition states that it attaches Directive 1 of 2021 as "Exhibit F," but only the original Petition for Review contains Exhibit F. Directive 1 of 2021 is also available on the Department of State's website. *See* SECRETARY OF THE COMMONWEALTH, DIRECTIVE CONCERNING ACCESS TO ELECTRONIC VOTING SYSTEMS, INCLUDING BUT NOT LIMITED TO THE IMAGING OF SOFTWARE AND MEMORY FILES, ACCESS TO RELATED INTERNAL COMPONENTS, AND THE CONSEQUENCES TO COUNTY BOARDS OF ALLOWING SUCH ACCESS (July 8, 2021), https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Directive-1-of-2021_Access-to-Electronic-Voting-Systems_7-8-2021.pdf (last visited May 20, 2022).

"continued to meet the requirements of the Election Code." *Id*. ¶¶47-49. Had she done so, she "would have found that the security and other requirements" of the law continue to be satisfied "and that such existing machines could readily be used by Fulton County." *Id*. ¶48.

The Amended Petition states that in her examination of Dominion's system pursuant to Section 1105-A(a) of the Election Code prior to approval of the system, "Respondent Secretary" used a vendor, Center for Civic Design, "to examine the Democracy Suite 5.5A voting system in 2019, [which vendor] does not appear on the EAC's [(U.S. Election Assistance Commission)] directory of accredited laboratories." Amended Petition ¶63.

The County challenged the Secretary's actions in a Petition for Review filed on August 18, 2021. It then filed the Amended Petition on September 17, 2021.[5] On October 18, 2021, the Secretary filed a demurrer to Count III of the Amended Petition.

In her demurrer, the Secretary asserts that she took action against the County because it "permitted a third party, a private company called Wake TSI with

---

[5] Ancillary to this proceeding, the Secretary filed an emergency application to prevent spoliation of evidence after the County granted a request by a committee of the Pennsylvania State Senate for the County's 2020 election data. Dominion then sought to intervene, alleging that any inspection by the Senate committee's contractor, Envoy Sage, LLC, would violate the County's contract with Dominion. The intervention petition did not include Dominion's proposed pleading or adopt by reference the pleading already filed by the petitioner or by the respondent. *See* Pa.R.Civ.P. 2328(a). This Court denied Dominion's intervention petition for the stated reason that a ruling on the County's challenge to the Secretary's decertification of the County's two voting devices, without a reexamination or a hearing, would have no impact on Dominion's common law contract claims. The Pennsylvania Supreme Court stayed the inspection by Envoy Sage pending the Secretary's appeal of this Court's interlocutory order denying the Secretary's request for a protective order. The Supreme Court also reversed this Court's denial of Dominion's intervention petition.

no election-related experience, to access and take images of key components of Fulton County's certified electronic voting equipment, thereby compromising the security of the equipment." Preliminary Objections ¶6. Because of "this unsanctioned breach of basic security protocols," the Secretary "'had no choice but to decertify the use' of Fulton County's compromised electronic voting equipment." *Id*. ¶7 (quotation from Secretary's letter of July 20, 2021).

With respect to Directive 1 of 2021, the Secretary asserts that it was expressly authorized by Section 1105-A(a) of the Election Code, 25 P.S. §3031.5(a). Relying on the Pennsylvania Supreme Court's decision in *Banfield v. Cortés*, 110 A.3d 155 (Pa. 2015), the Secretary argues that she has the responsibility to regulate the counties in their inspection of electronic voting systems, and, further, her directives issued for this purpose cannot be set aside unless fraudulent or arbitrary.

The County responds that the Secretary's prohibition against a county's inspection of its electronic voting devices cannot be reconciled with Section 302(d) and (g) of the Election Code, which obligates county boards of elections to appoint "their own" "machine inspectors" to "inspect systematically and thoroughly the conduct of primaries and elections." 25 P.S. §2642(d), (g). The County rejects the Secretary's claim that Section 1105-A(a) effected an implied repeal of the County's duties and powers under Section 302 of the Election Code.

We begin with a review of the applicable provisions of the Election Code and the relevant case law precedent.

8

**Election Code Provisions**

**a. Article XI-A of the Election Code**

Section 1105-A of the Election Code addresses the qualification of electronic voting systems for use in Pennsylvania.  It states in its entirety as follows:

(a) *Any person* or corporation owning, manufacturing or selling, or being interested in the manufacture or sale of, any electronic voting system, *may request the Secretary of the Commonwealth to examine such system* if the voting system has been examined and approved by a federally recognized independent testing authority and if it meets any voting system performance and test standards established by the Federal Government.  The costs of the examination shall be paid by the person requesting the examination *in an amount set by the Secretary* of the Commonwealth.  *Any ten or more persons, being qualified registered electors of this Commonwealth, may, at any time, request the Secretary of the Commonwealth to reexamine* any electronic voting system theretofore examined and approved by him.  Before any reexamination, the person, persons, or corporation, requesting such reexamination, shall pay to the Treasurer of the Commonwealth a reexamination fee of four hundred fifty dollars ($450).  *The Secretary of the Commonwealth may, at any time, in his discretion, reexamine* any such system therefore examined and approved by him.  *The Secretary of the Commonwealth may issue directives or instructions for implementation of electronic voting procedures and for the operation of electronic voting systems.*

(b) *Upon receipt of a request for examination or reexamination* of an electronic voting system as herein provided for or in the event he determines to reexamine any such system, *the Secretary of the Commonwealth shall examine the electronic voting system* and shall make and file in his office his report, attested by his signature and the seal of his office, stating whether, in his opinion, the system so examined can be *safely used by voters at elections as provided in this act and meets all of the requirements*

9

*hereinafter set forth.*[6] *If his report states that the system can be so used and meets all such requirements, such system shall be deemed approved* and may be adopted for use at elections, as herein provided. With respect to any electronic voting system approved for use in this Commonwealth by the secretary, *the report of the secretary shall specify the capacity of the components of that system, the number of voters who may reasonably be accommodated* by the voting devices and automatic tabulating equipment which comprise such system and *the number of clerks and machine inspectors*, if any, required based on the number of registered electors in any election district in which the voting system is to be used, such specifications being based upon the secretary's examination of the system. Any *county which thereafter may adopt any such approved system shall provide the components of such system in a number no less than that sufficient* to accommodate the voters of that county or municipality in accordance with the minimum capacity standards so prescribed by the secretary. *The county board shall comply with the requirements for the use of the electronic voting system as set forth in the report by the Secretary of the Commonwealth.*

(c) No electronic voting system not so approved shall be used at any election, and if, upon the reexamination of any such system previously approved, it shall appear that the system so reexamined can no longer be used safely by voters at elections as provided in this act or does not meet the requirements hereinafter set forth, the approval of that system shall forthwith be revoked by the Secretary of the Commonwealth, and that system shall not thereafter be used or purchased for use in this Commonwealth.

(d) When an electronic voting system has been so approved, no improvement or change that does not impair its accuracy, efficiency or capacity or its compliance with the requirements hereinafter set forth, shall render necessary the reexamination or reapproval of such system.

(e) Neither the Secretary of the Commonwealth nor any member of a county board of elections shall have any pecuniary interest

---

[6] Section 1107-A of the Election Code, added by the Act of July 11, 1980, P.L. 600, 25 P.S. §3031.7, sets forth requirements for electronic voting systems.

in any electronic voting system or in any of the components thereof, or in the design, manufacture or sale thereof.

25 P.S. §3031.5 (emphasis added). Each subsection relates to a separate aspect of the Secretary's qualification of electronic voting systems.

Section 1105-A(a) governs the Secretary's examination and reexamination of electronic voting systems and the procedures therefor.[7] Specifically, the Secretary must examine any electronic voting system upon the request of "[a]ny person or corporation" that manufactures or sells electronic voting systems, *i.e.*, vendors. 25 P.S. §3031.5(a). To make a request, the applicant vendor's system must satisfy "any system performance and test standards established by the Federal Government." *Id.* The applicant vendor must pay for the Secretary's examination, and this examination is required before any electronic voting system can be approved for use in Pennsylvania. In addition, subsection (a) authorizes 10 or more "qualified registered electors of this Commonwealth" to request a reexamination upon payment of a $450 fee. *Id.* In connection with either an examination or reexamination, the Secretary may "issue *directives or instructions* for implementation of electronic voting procedures and for the operation of electronic voting systems." *Id*. (emphasis added).

The legislature chose the word "directive" as opposed to the word "regulation." Historically, "management directives," along with administrative

_____

[7] There is nothing new about the Secretary's examination or reexamination of voting systems. Section 1105-A (within Article XI-A) is patterned on Section 1106 (within Article XI) of the Election Code, 25 P.S. §3006, which governs the examination of voting machines and dates back to 1937. Article XI-A governs the examination of electronic voting systems and was added to the Election Code in 1980. The two articles are similar in structure and content, but they differ in terminology. For example, Article XI refers to "voting machines" throughout, whereas Article XI-A defines and uses "electronic voting systems" and "voting devices."

circulars and procedural manuals, are used by the Governor to manage executive branch agencies and their employees. *See Cutler v. State Civil Service Commission (Office of Administration)*, 924 A.2d 706, 710-12 (Pa. Cmwlth. 2007). We have explained:

> A management directive is not an administrative regulation with the force and effect of law.[] *See Tire Jockey Service, Inc. v. Department of Environmental Protection*, [] 915 A.2d 1165, 1186 ([Pa. ]2007) (explaining that an agency's duly promulgated legislative-type regulation "is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable[]"). A management directive is a tool for managing people in the executive branch of state government.[] It is important to consider the differences between an administrative regulation and a management directive.

*Cutler*, 924 A.2d at 711-12 (footnotes omitted). *See also Shapp v. Butera*, 348 A.2d 910, 913 (Pa. Cmwlth. 1975) (explaining that a gubernatorial directive "intended for communication with subordinate officials . . . for the execution of the duties of the Executive Branch of government" is non-justiciable and not enforceable by court order).

Notably, an agency regulation, regardless of its title, must be promulgated in accordance with "the framework of laws governing agency rulemaking in Pennsylvania." *Corman v. Acting Secretary of Pennsylvania Department of Health*, 266 A.3d 452, 486 (Pa. 2021). In *Newport Homes, Inc. v. Kassab*, 332 A.2d 568, 575 (Pa. Cmwlth. 1975), this Court held that "[h]aving failed to comply with the Commonwealth Documents Law,[8] the 'final directive' issued

---

[8] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§1102-1602, 45 Pa. C.S. §§501-907.

12

by PennDOT[9] is a nullity." In *Corman,* the Supreme Court considered a state agency order to every school district in Pennsylvania to require all persons in a school (parents, teachers, students) to wear a mask to control the spread of COVID-19. The Acting Secretary of Health asserted that because she was authorized to issue this order under the applicable disease control statute, the order was exempt from laws governing an agency's promulgation of regulations. The Supreme Court rejected this argument, explaining as follows:

> [A]bsent a gubernatorial disaster emergency declaration suspending the framework of laws governing agency rulemaking in Pennsylvania, the Department [of Health] was obligated to follow the procedures set forth in the Regulatory Review Act,[10] the Commonwealth Documents Law, and the Commonwealth Attorneys Act[11] *before promulgating a new disease control measure with the force of law*.[] Because the Secretary circumvented that process, her Order was void *ab initio*.

*Corman*, 266 A.3d at 486-87 (emphasis added and footnote omitted).

After an examination of an electronic voting system conducted under Section 1105-A(a) of the Election Code, the Secretary must file a "report" in her office stating that the examined system "can be safely used by voters." Section 1105-A(b) of the Election Code, 25 P.S. §3031.5(b). Further, the Secretary's report "*shall specify the capacity* of the components of that system, the *number of voters who may reasonably be accommodated* by the voting devices and automatic tabulating equipment which comprise such system and the *number of clerks and machine inspectors*, if any, required based on the number of registered electors in any election district in which the voting system is to be used[.]" *Id*. (emphasis

---

[9] PennDOT is an acronym for the Pennsylvania Department of Transportation.

[10] Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§745.1-745.15.

[11] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§732-101–732-506.

13

added). In choosing an approved electronic voting system, the county boards of elections must be mindful of the "minimum capacity standards so prescribed by the [S]ecretary" and purchase "the components of such system in a number no less than that sufficient to accommodate the voters of that county." *Id.* Likewise, county boards must employ the proper number of "clerks and machine inspectors" based on the number of electors in the county. *Id.*

Where a reexamination by the Secretary shows that a system can no longer be safely used at an election, "the approval of that system shall forthwith be revoked." Section 1105-A(c) of the Election Code, 25 P.S. §3031.5(c). Approval does not place an electronic voting system in amber. A "change" to a system "that does not impair its accuracy, efficiency or capacity" does not require a "reexamination or reapproval of such system." Section 1105-A(d) of the Election Code, 25 P.S. §3031.5(d). Subsection (d) does not specify the agent of this change or its occasion.

The Election Code defines the terms "electronic voting system" and "voting device" for purposes of Article XI-A of the Election Code as follows:

> "**Electronic voting system**" means a system in which one or more voting devices are used to permit the registering or recording of votes and in which such votes are computed and tabulated by automatic tabulating equipment. The system shall provide for a permanent physical record of each vote cast.
>
> * * *
>
> "**Voting device**" means either an apparatus in which paper ballots or ballot cards are used in connection with an implement by which a voter registers his votes with ink or other substance or by punching, *or an apparatus by which such votes are registered electronically*, so that in either case the votes so registered may be computed and tabulated by means of automatic tabulating equipment.

Section 1101-A of the Election Code, 25 P.S. §3031.1 (emphasis added).  Section 1105-A(a) uses the phrase "electronic voting systems," but the phrase "voting devices" does not appear.

**b. Article III of the Election Code**

Section 302 of the Election Code makes the county boards of elections responsible for the honest, efficient and uniform conduct of elections.  It states, in relevant part, as follows:

> *The county boards of elections, within their respective counties, shall exercise, in the manner provided by this act, all powers granted to them by this act, and shall perform all the duties imposed upon them by this act,* which shall include the following:
>
> (a) To investigate and report to the court of quarter sessions their recommendations on all petitions presented to the court by electors for the division, redivision, alteration, change or consolidation of election districts, and to present to the court petitions for the division, redivision, alteration, change or consolidation of election districts in proper cases.
>
> (b) To select and equip polling places that meet the requirements of this act.
>
> (c) *To purchase, preserve, store and maintain primary and election equipment of all kinds,* including voting booths, ballot boxes and voting machines, and to procure ballots and all other supplies for elections.
>
> (d) *To appoint their own employes, voting machine custodians,* and *machine inspectors*.
>
> * * *
>
> (f) *To make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors.*

(g) To instruct election officers in their duties, calling them together in meeting whenever deemed advisable, and *to inspect systematically and thoroughly the conduct of primaries and elections* in the several election districts of the county *to the end that primaries and elections may be honestly, efficiently, and uniformly conducted.*

\* \* \*

(i) To investigate election frauds, irregularities and violations of this act, and to report all suspicious circumstances to the district attorney.

\* \* \*

25 P.S. §2642(a)-(d), (f)-(g), and (i) (emphasis added).

In addition to making the county boards of elections responsible for the conduct of honest elections, Section 302 gives them the means to carry out this responsibility. The county boards of elections are empowered to purchase and maintain "election equipment of all kinds" and "appoint their own … voting machine custodians, and machine inspectors." 25 P.S. §2642(c), (d). Incidental thereto, the county boards are empowered to "make and *issue such rules, regulations and instructions*, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, election officers and electors." 25 P.S. §2642(f) (emphasis added). The county boards are required to "investigate election frauds, irregularities and violations of [the Election Code], and to report all suspicious circumstances to the district attorney." 25 P.S. §2642(i).

Section 302 imposes mandatory duties upon the county boards of elections as well as discretionary authority and powers, such as the power to promulgate regulations. In addition, county boards have been given the power to issue subpoenas. *See* Section 304(a) of the Election Code, 25 P.S. §2644(a). The

16

Supreme Court has held that in their investigation of the conduct of elections, the county boards of elections exercise quasi-judicial authority. *Appeal of McCracken*, 88 A.2d 787, 788 (Pa. 1952).

## Analysis

In reviewing preliminary objections in the nature of a demurrer, this Court "must accept as true all well[-]pleaded material allegations in the petition for review, as well as all inferences reasonably deduced therefrom." *Buoncuore v. Pennsylvania Game Commission*, 830 A.2d 660, 661 (Pa. Cmwlth. 2003). We are not required to accept as true "conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion." *Id.* For this Court to sustain preliminary objections, "it must appear with certainty that the law will not permit recovery[.]" *McCord v. Pennsylvania Gaming Control Board*, 9 A.3d 1216, 1218 n.3 (Pa. Cmwlth. 2010) (quoting *Pennsylvania State Lodge, Fraternal Order of Police v. Department of Conservation and Natural Resources*, 909 A.2d 413, 415-16 (Pa. Cmwlth. 2006)). Where there is any doubt, this Court will overrule the preliminary objections. *Fumo v. Hafer*, 625 A.2d 733, 734 (Pa. Cmwlth. 1993).

The Secretary requests the Court to dismiss Count III, the County's challenge to Directive 1 of 2021. Noting that Section 1105-A(a) of the Election Code authorizes the Secretary to issue "directives or instructions" for "the operation of electronic voting systems," the Secretary argues that Directive 1 of 2021 was expressly authorized. 25 P.S. §3031.5(a). Further, because the Amended Petition does not allege that Directive 1 of 2021 was issued fraudulently, in bad faith or arbitrarily, the terms of Directive 1 of 2021 are unassailable. The Secretary argues that as the Commonwealth's chief election official, she has been empowered to regulate, by directive, the county boards in the use of their voting devices, and these

17

directives are enforced by her power of "decertification." Necessarily, she adds, her authority over electronic voting systems includes individual electronic voting devices.

The County rejects the Secretary's expansive view of Section 1105-A(a) of the Election Code. It acknowledges the Secretary's responsibility to examine and approve an electronic voting system before it can be used in Pennsylvania but believes her responsibility ends there. At that point, the county boards of elections become responsible. From the Secretary's approved system list, the county board makes a choice appropriate for the county's voting population; purchases the "components" of that chosen system; and uses those components on election day and thereafter in any post-election inspections. Component security is the county board's duty. It is the county boards, not the Secretary, that must "maintain primary and election equipment of all kinds" and appoint inspectors thereof. Section 302(c) and (d) of the Election Code, 25 P.S. §2642(c), (d). Stated otherwise, with respect to electronic voting systems, the Election Code vests the Secretary with responsibility at the macro level and vests the county boards of elections with responsibility at the micro level.

The County argues that Directive 1 of 2021 violates Section 302 of the Election Code in multiple ways and was not authorized by Section 1105-A(a) of the Election Code. Although Directive 1 of 2021 purports to authorize the Secretary to decertify a county's voting devices, Section 1105-A(a) relates to electronic voting systems, not specific devices. In any case, under Section 1105-A(a), no "decertification," whether of a system or of a device, can be done until there is a

reexamination. Here, the Secretary did not reexamine the County's two voting devices before she decertified them.[12]

Here, both parties argue the merits of their respective actions, but these arguments are premature. For purposes of the Secretary's demurrer, it is irrelevant whether she had good cause to issue Directive 1 of 2021 and whether it will improve election security in Pennsylvania. Likewise, the statements in the Secretary's Preliminary Objections that Wake TSI had no election experience and that its imaging compromised "the security of the equipment" are irrelevant to the lawfulness of Directive 1. Preliminary Objections ¶6. These statements are also inappropriate because they contradict the allegations in the Amended Petition that Wake TSI was experienced, did not perform a "full technology forensic audit of the operating system or the EMS [(Election Management System)]" and in no way compromised the security of the County's two voting devices. Amended Petition ¶68. Only the factual allegations in the Amended Petition can and will be considered; they are binding on the Court in its analysis of the Secretary's demurrer to Count III. *Buoncuore*, 830 A.2d at 661. The Secretary's contrary statements belong in an answer and new matter; they have no place in a demurrer.

The Secretary bases her demurrer to Count III of the Amended Petition largely upon the Supreme Court's holding in *Banfield*, 110 A.3d 155. In *Banfield*, 24 qualified registered electors instituted a mandamus action against the Secretary of the Commonwealth, requesting that the Secretary be ordered to revoke her approval of direct recording electronic voting systems. The Supreme Court held that the Secretary's decision to approve an electronic voting system involved the exercise of discretion and, as such, was beyond the reach of a writ of mandamus. In so

---

[12] The County notes that, in any case, because only one voting device was ever used, her decertification letter was overbroad in scope. Amended Petition ¶48, n.1.

holding, the Supreme Court observed that the Secretary is "Pennsylvania's chief election official." *Id.* at 174. *See also National Election Defense Coalition v. Boockvar*, 266 A.3d 76, 96-98 (Pa. Cmwlth. 2021) (overruling Secretary's demurrer to a challenge by electors to the Secretary's refusal to disapprove an electronic voting system).

*Banfield* did not concern "instructions or directives" issued under Section 1105-A(a) of the Election Code. Rather, *Banfield* concerned a quasi-adjudicatory decision with respect to a discrete electronic voting system. The "fraudulent, in bad faith, an abuse of discretion or clearly arbitrary" standard was recited in the context of a demurrer to a mandamus action. *Banfield*, 110 A.3d at 175. As the Supreme Court explained, "[w]here the action sought to be compelled is discretionary, mandamus will not lie to control that discretionary act, ... but courts will review the exercise of the actor's discretion where it is arbitrary or fraudulently exercised or is based upon a mistaken view of the law." *Id*. (quoting *Pennsylvania State Association of County Commissioners v. Commonwealth*, 681 A.2d 699, 701-02 (Pa. 1996)). The Supreme Court's passing description of the Secretary as Pennsylvania's "chief election official" is *obiter dictum*. *Banfield*, 110 A.3d at 174. Regardless, this description does not answer the question of whether the Secretary can supervise the county boards of elections in the way they perform their duties under Section 302 of the Election Code. *Banfield* is inapposite.

Any statutory construction exercise begins with careful examination of the words actually chosen by the legislature. *See* 1 Pa. C.S. §1921(b); *Commonwealth v. Shiffler*, 879 A.2d 185, 189 (Pa. 2005) ("[T]he best indication of legislative intent is the plain language of the statute.") (quotation omitted). "In ascertaining the plain meaning of statutory language, we consider it in context and

give words and phrases their 'common and approved usage.'" *In re Canvassing Observation*, 241 A.3d 339, 349 (Pa. 2020) (quoting *Commonwealth by Shapiro v. Golden Gate National Senior Care, LLC*, 194 A.3d 1010, 1027-28 (Pa. 2018)). "Consistent with these principles, when construing a statute 'we must listen attentively to what the statute says, but also to what it does not say.'" *In re Canvassing Observation*, 241 A.3d at 349 (quoting *Discovery Charter School v. School District of Philadelphia*, 166 A.3d 304, 321 (Pa. 2017)).

Section 1105-A(a) of the Election Code authorizes the Secretary to issue "directives or instructions," not "regulations," with respect to the "implementation of electronic voting procedures and for the operation of electronic voting systems." 25 P.S. §3031.5(a). Notably, the directive authorization is limited to subsection (a), which concerns the examination and reexamination of electronic voting systems. The directive authorization does not apply to the entirety of Section 1105-A as a stand-alone subsection. The question, then, is to what end may the Secretary issue a directive about electronic voting systems.

Subsection (a) relates solely to the procedures by which a vendor may seek approval of its electronic voting system. In that context, directives and instructions are appropriate to instruct vendors on how to succeed in their quest for the Secretary's approval.[13] Such directives have an analog in government procurement. A government agency invites requests for proposal (RFP) from contractors seeking to do work for the government. In this invitation, the agency sets forth detailed terms, or directives, on how to submit a proposal and the agency's performance expectations. *See, e.g.*, *Dragani v. Borough of Ambler*, 37 A.3d 27, 31 (Pa. Cmwlth. 2012) (bidder or offeror must strictly comply with terms of an RFP in

_____

[13] Electors seeking a reexamination would also use the Secretary's directives or instructions but to look for a deviation therefrom.

21

order to be awarded a contract); *Gaeta v. Ridley School District*, 788 A.2d 363, 364 (Pa. 2002) (invitation to bid set forth instructions on date and time of submission, bid bonds and surety quality in addition to bid amount for construction of school).

Here, the Secretary reads her authority to issue a "directive" as an end in itself, *i.e.*, as a grant of power to regulate county boards of elections. So long as her publication is called a "directive" and says something about electronic voting systems, or voting devices, it is authorized. There are several impediments to this proffered legal position.

First, Section 1105-A of the Election Code refers repeatedly to electronic voting systems and only once to voting devices, in subsection (b).[14] Nowhere does Section 1105-A use the word certification or decertification. Likewise, it does not authorize the Secretary's approval of a county board's voting device, let alone its disapproval. Subsection (a) does not mention county boards of elections, only electors and vendors and other persons desirous of getting an electronic voting system on (or off) the Secretary's approved list.

Second, the legislature has not conferred rulemaking power upon the Secretary anywhere in the Election Code. By contrast, the legislature has expressly vested county boards of elections with this power. *See* Sections 1111(c) and 1110-A(d) of the Election Code, 25 P.S. §§3011(c), 3031.10(d)[15] (stating that county boards may make reasonable rules and regulations concerning the conduct of political party representatives present during election preparation). Unlike a management directive, a regulation has general application and has the force and effect of law. *Corman*, 266 A.3d at 462.

---

[14] Subsection (b) also refers to "components" of electronic voting systems as well as "voting devices" and "automatic tabulating equipment." 25 P.S. §3031.5(b).

[15] Added by the Act of July 11, 1980, P.L. 600.

22

Third, the Secretary does not explain why she may regulate the county boards' handling of their voting devices when Section 1105-A(a) authorizes her approval, or disapproval, of entire systems.[16] Instead, the Secretary treats "systems" and "devices" as interchangeable words, in derogation of their statutory definitions. Notably, Section 1104-A(a) of the Election Code[17] requires counties to acquire and install "components of an electronic voting system *of a kind* approved" by the Secretary. 25 P.S. §3031.4(a) (emphasis added). Section 1104-A supports the County's view that the Secretary may issue instructions or directives about systems or types, not individual voting devices or "components."

Fourth, subsection (a) relates exclusively to the procedures by which an electronic voting system can be approved or subsequently disapproved. It does not provide a substantive standard for the examination and approval of a system. It merely requires the applicant vendor to comply with federal standards, if any, as a precondition to requesting the Secretary's examination.

Subsection (b) does contain a substantive standard in that it requires the Secretary's report on the examined and approved system to attest that the system "can be safely used by voters at elections." Section 1105-A(b) of the Election Code, 25 P.S. §3031.5(b). Safe use has been the standard for every manner of voting machinery since at least 1937. *See* Section 1106(b) of the Election Code, 25 P.S. §3006(b). However, Section 1105-A(b) does not authorize or require the Secretary to issue "directives or instructions," only "reports" that will guide the county boards, *inter alia*, in their purchase of a sufficient number of components. 25 P.S.

---

[16] The Secretary does not address Section 207 of the Election Code, added by the Act of October 31, 2019, P.L. 552, 25 P.S. §2627, which speaks to the disapproval of "voting apparatuses," presumably by the disapproval of a widely-used electronic voting system.

[17] Added by the Act of July 11, 1980, P.L. 600.

23

§3031.5(b).  It is noteworthy that the Secretary's report on Dominion speaks to the county's use of third-party vendors.  *See, e.g.*, Amended Petition, Ex. A at 44 (providing that any "data transfer between the vendor and county must be done using encrypted physical media or secure file transfer process").

The Secretary's insistence that the power to issue a directive has conveyed to her the power to regulate county boards of elections is a position that raises both procedural and substantive questions.  It is beyond peradventure that an agency may exercise only those powers conferred by "clear and unmistakable language."  *Aetna Casualty and Surety Company v. Insurance Department*, 638 A.2d 194, 200 (Pa. 1994) (quotation omitted).

As the County points out, Section 1105-A must be read together with Section 302.  "Every statute shall be construed, if possible, to give effect to all its provisions."  1 Pa. C.S. §1921(a).  Statutes that relate to the same subject "shall be construed together, if possible, as one statute."  1 Pa. C.S. §1932(b).  All provisions of the Election Code are *in pari materia*.  *In re Philadelphia County Board of Elections*, 73 A.2d 34, 36 (Pa. 1950).

Here, Section 302(g) of the Election Code obligates county boards of elections to "inspect systematically and thoroughly the conduct of primaries and elections in the several election districts of the county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted."  25 P.S. §2642(g).  The Secretary argues that this provision does not address *how* the county boards are to inspect, and, thus, she believes that the county boards must follow her directives with respect to inspection, or non-inspection, of electronic voting devices.  Preliminary Objections ¶¶22-27; Secretary's Brief at 14-15.   The Secretary maintains that because Section 1105-A(a) is the specific and later-in-time provision,

24

it has superseded Section 302. Preliminary Objections ¶¶28-29; Secretary's Brief at 13-16. This interpretation, she argues, is entitled to deference.

For its part, the County emphasizes that Section 1105-A(a) uses the permissive "may issue," but Section 302 uses the mandatory "shall perform" with respect to a county board of elections' duty to inspect voting equipment of all kinds, including its electronic devices. Inspections of election equipment are part and parcel of the Election Code. For example, Section 1230 of the Election Code, 25 P.S. §3070, provides that a county board of elections must permit inspection of its voting machines "by direction of any legislative committee." Even so, Directive 1 of 2021 does not regulate the manner of the county boards' inspections; rather, it effectively prohibits inspections altogether.

We reject the Secretary's claim that her view of the Election Code is entitled to deference. First, her construction of Section 1105-A(a) as superseding a county board's ability to inspect its voting devices is not consonant with her earlier interpretation that was expressed in the 2016 and 2020 Guidances. An agency's revision to its interpretation of a statute defeats its claim for deference. *See Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission*, 123 A.3d 1124, 1135 (Pa. Cmwlth. 2015) ("An administrative agency may revise and correct its prior interpretation of a statute. However, it cannot expect that its later interpretation is entitled to very much deference").[18] Second, the County can also claim to be entitled to deference with respect to its interpretation of Section 302. It is the government agency charged with its enforcement. The interpretation

---

[18] The Secretary neither acknowledges nor offers an explanation for the change between the 2016 and 2020 Guidances and Directive 1 of 2021. *See, e.g.*, *Sacred Heart Medical Center v. Sullivan*, 958 F.2d 537, 544 (3d Cir. 1992) (agency must offer a "reasoned justification" for change in its statutory interpretation or policy modification).

of a statute is, in any case, the prerogative of the judiciary. *Crown Castle NG East LLC v. Pennsylvania Public Utility Commission*, 234 A.3d 665, 679-80 (Pa. 2020).

In her claim of regulatory authority over the county boards of elections, the Secretary has not engaged with the text and structure of Section 1105-A of the Election Code. This omission, in itself, prevents a ruling in her favor on her demurrer to Count III. When also considering a county board of elections' independent duties under the Election Code, we cannot say with certainty at this juncture that Count III does not state a claim. The Secretary asks the Court to take the entire subject matter of electronic voting systems out of the County's purview, but she does so without providing the Court a careful reading of the Election Code. Limitations on the County's power, if any, will become evident in the course of the Court's consideration of Counts I and II, and Count III. We may sustain a preliminary objection only if it is certain that the County's challenge to Directive 1 of 2021 fails as a matter of law. The Secretary's legal position leaves many doubts.

**Conclusion**

Tampering with election equipment of any kind is a grave matter. Whether prevention thereof is the responsibility of the Secretary or of the county boards of elections, or both, is not clear. Both are government agencies created by the General Assembly with discrete and separate roles to fulfill toward the end of honest elections in Pennsylvania. Both agencies are presumed to act lawfully and reasonably in the exercise of their statutory duties. *Pennsylvania Retailers' Associations, Reliable, Inc. v. Lazin*, 426 A.2d 712, 717 (Pa. Cmwlth. 1981). The county boards of elections are not bureaus within the Department of State subject to management by the Secretary of the Commonwealth. They are separate and stand-alone government agencies.

Concluding that the Secretary's legal position faces many hurdles, we overrule the Secretary's preliminary objection to Count III of the Amended Petition.

_____
MARY HANNAH LEAVITT, President Judge Emerita

Judge Wallace did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

County of Fulton, Fulton County Board :
of Elections, Stuart L. Ulsh, in his :
official capacity as County :
Commissioner of Fulton County and :
in his capacity as a resident, taxpayer :
and elector in Fulton County, and Randy :
H. Bunch, in his official capacity as : No. 277 M.D. 2021
County Commissioner of Fulton County :
and in his capacity as a resident, :
taxpayer and elector of Fulton County, :
                                    Petitioners :
                    v.                :
                                       :
Secretary of the Commonwealth, :
                                    Respondent :

## **O R D E R**

AND NOW, this 23rd day of May, 2022, the preliminary objection filed by the Secretary of the Commonwealth in the above-captioned matter is hereby **OVERRULED**. The Secretary of the Commonwealth shall file an answer to the amended petition for review within thirty (30) days of the date of this order.

_____
MARY HANNAH LEAVITT, President Judge Emerita